In re BYMAN FURNITURE &
INTERIORS, INC., Debtor.

J. Craig COWGILL, Trustee for the
Estate of Byman Furniture &
Interiors, Inc., Plaintiff,

v.

Irwin ACKER, Defendant.

Bankruptcy No. 80–00092–HB.
Adv. No. 80–0608–HP.

United States Bankruptcy Court,
S. D. Texas,
Houston Division.

Sept. 29, 1981.

Rosemary Williams, Brill, Brooks, Powell & Yount, Houston, Tex., for plaintiff/trustee.

Irwin Acker, pro se.

## MEMORANDUM OPINION

JOHN R. BLINN, Bankruptcy Judge:

The saga of Byman Furniture & Interiors, Inc. began in January, 1980 when Irwin Acker filed a Chapter 11 petition on its behalf. Byman originally operated as a

Debtor-in-Possession but the Creditors' Committee successfully sought appointment of a trustee. Shortly thereafter Byman and Mr. Acker came to a parting of the ways, and attorney Margaret Matthews Mobley was substituted as Debtor's counsel.

After investigating the Debtor's affairs, the Trustee, J. Craig Cowgill, filed two proceedings against Mr. Acker. The first was a Complaint to Compel Turnover, or in the Alternative, for Conversion and Damages in Adversary Proceeding No. 80–0608–HB. The second—in the main case—was an Application by Trustee for Examination of Payment and Transfers Made by Debtor to Attorney Pursuant to Bankruptcy Rule 220. These matters were combined in a hearing which spanned three days; this opinion is a determination of the issues raised in both the Complaint and Application.

The following scenario unfolded at the trial: Byman Furniture & Interiors, Inc. came into being in 1976 when its president and sole stockholder, Warren Duncanson, came to Houston from Chicago. Since that time Byman operated as a furniture store with Mr. Duncanson serving both as buyer and interior designer. Unfortunately, Texas proved no more hospitable for Mr. Duncanson's business pursuits than Illinois, and in the fall of 1979 Byman began experiencing financial difficulties.

Mr. Duncanson consulted Mr. Acker, an attorney he had previously dealt with in conjunction with a community center for which Mr. Duncanson served as a director. Mr. Acker represented Byman in state court proceedings brought by a number of creditors; he also counseled Byman on bankruptcy law. Finally in 1980 he suggested that Byman file a Chapter 11 reorganization and drew the initial pleadings.

During an eight-month period surrounding the filing date, Mr. Acker received various items of furniture from Byman. According to the testimony, Mr. Acker and his wife from time to time came into the store and chose items; several times Mr. Duncanson made suggestions as to which furniture would be appropriate for Mr. Acker's home and office. Apparently these gentlemen had some understanding of these transactions relating to Mr. Acker's attorney's fee. Mr. Duncanson wrote up sales slips on the items but Byman never received any payment on Mr. Acker's furniture account which crept to $26,355.01 by the time of trial. On the other hand, Mr. Acker never billed Byman for his services. When Mr. Duncanson made inquiries regarding these accrued fees, Mr. Acker indicated that he wished to wait until the end of the proceedings for "settling up" with the Debtor.

At trial Mr. Acker argued the furniture should not be considered as a single entity, but rather categorized into three groups—furniture transferred as security for his bankruptcy attorney's fee, delivered as payment for nonbankruptcy pre-petition legal work, and given by Mr. Duncanson as a personal friend. However, Mr. Acker was unable to prove what furniture would be considered as belonging to what group or even the existence of the categories at all. Evidence which allegedly existed to support Mr. Acker's contentions, such as thank you notes, testimony of Byman personnel, etc., was neither brought nor subpoenaed by him for the trial. Nor did Mr. Acker examine Mr. Duncanson during Mr. Duncanson's lengthy time on the stand as to the understanding between them concerning the furniture transfers. With regard to the furniture allegedly transferred in payment of the pre-petition legal debt, Mr. Acker made no showing as to the amount of the debt, and had not in fact disclosed in any document filed before the Bankruptcy Court that he was either a creditor of the Debtor or the recipient of a large legal fees settlement immediately before the bankruptcy was filed. Most damaging of all was Mr. Acker's admission on cross-examination that "... this furniture ... it belongs to the Debtor. It is part of the assets, and the Trustee or any agent appointed by the Court will be able to get it quick enough." In short, there was no rebuttal by Mr. Acker of the substantial evidence presented by the Trustee—or of Mr. Acker's own testimony—that all of the furniture is part of

the estate of the Debtor. Accordingly, the Trustee is entitled to a return of all furniture or a judgment for the reasonable value thereof.

The remaining issue is the reasonableness of attorneys' fees under Rule 220. The Trustee makes numerous arguments that the only fee that should be allowed is the reimbursement of the filing fee for the Chapter 11 petition. First, the Trustee alleges that the representation Byman received was inadequate, that Mr. Acker neither performed competently nor possessed the background to successfully represent a Chapter 11 debtor. Second, despite his awareness that his bankruptcy knowledge was limited, Mr. Acker refused to associate with more experienced counsel. Third, Mr. Acker never received authorization by the Court to represent the Debtor. Finally, Mr. Acker failed to document his fees with the specificity required by the Bankruptcy Code.

■ The record substantiates the Trustee's first two arguments.[1] Mr. Acker testified that he had only represented debtors in

---

1. The following excerpts give some of the flavor of this case and the type of representation provided by Mr. Acker:

Q (by counsel for the Trustee) Well, Mr. Acker, if I am missing where in this plan you have provided for treatment of administrative claims, priority claims or secured claims, I would be more than happy if you will show me where I am missing, but I don't see any treatment.

A (by Irwin Acker) You are right. It isn't there. But, I felt under the circumstances the way they were going, the way it was taking so long for them to get their records together, they were always in a turmoil with little things. They are talking to people about selling it. They are talking to other people about getting financing for them, and they had a number of dichotomies themselves. I couldn't get together with them. I knew at the time as long as there was not irreparable occurring, in a sense where there was an emergency taking place legally at that point, I knew we would have to go ahead and file an amended petition and state it specifically as you have asked me: the priorities, the secured creditors, the unsecured creditors and trying to cure everything that was done through an amended disclosure statement.

Q (by counsel for the Trustee) Mr. Acker, are you familiar with the local rules for the United States Bankruptcy Court for the Southern District?

A (by Irwin Acker) Which rule are you talking about? I have read some rules, yes.

Q You have read the local rules?

A Yes, I believe I have.

Q Did you counsel with your clients as to the ways that they could comply with the requirements of those local rules?

A You will have to be specific and tell me what you are referring to.

Q Did you call your client in and advise them, tell them what the requirements were in operating in a Chapter 11, what they needed to do to be in compliance with the Bankruptcy Rules and local rules of this Court?

A Yes. I believe I discussed generally with them the important aspects of the rules, I believe.

Q Did you suggest to them they might establish escrow accounts for tax money?

A Well, not—Yes, I suggested that. That's right. I certainly did. I used the word, escrow. I used the word.

Q Did you provide any information in the disclosure statement as to what the liquidation value of this estate might have?

A What the—

Q What the liquidation value, the value the estate might have if it did indeed become a straight bankruptcy?

A Did I know if it was a straight bankruptcy how much the assets would be? Is that what you are asking?

Q Liquidation value. The value of the sale of its assets less—

A No. I didn't get into that, because we never got into it. I never met with his accountant. He never brought me the records. It was never his purpose nor mine. It was always our purpose to come up with a plan so we could pay off the creditors and take care of whatever he had to do and have the Court say, fine, now you can operate Byman Furniture. Everything is worked out now. You know, that sort of thing.

(from Mr. Acker's final argument)

Your Honor, let me begin by quoting—this is a classic case of a situation where the Courts speak in terms of—I can best show it by citing something here—Well, let me go on. In Section (d) it states it is settled, that it is the contemplation of the Debtor, not his attorney. That's the issue. It is settled that it is the contemplation of the Debtor, the controlling factor that states under Section 60(d) proceeding is the state of mind of the Debtor. They talk in terms of in a seminar, the third seminar, the referees in bankruptcy, there is a section which says, it is well settled that the legal search is covenant and not limited to a contemplated bankruptcy. It talks in terms of the nature of services rendered and to be rendered. . . .

two or three other bankruptcies under the Code, all of which were Chapter 7 liquidations. He had never handled a Chapter 11 under the Code nor the Act. His formal training in the new Bankruptcy Code consisted of a single seminar at the South Texas College of Law lasting several hours; informally, he claimed to have read the Code, bankruptcy cases, and treatises, but did not demonstrate the extent of his self-education. Despite the problems he encountered understanding the new Code, he rejected the idea of obtaining a bankruptcy lawyer as co-counsel, arguing that by refraining from doing so he was in some way protecting Byman.

A quick perusal of the schedules, plan and disclosure statement filed by Mr. Acker for Byman reveals the extent of Mr. Acker's incompetence to handle a Chapter 11 case. He admitted that deficiencies existed in the pleadings, but thought they could be cured by amendment. Again and again he projected the belief that the Bankruptcy Court would help him and give him time to correct his mistakes, saying, "I always took the attitude I can make mistakes if people don't get hurt. If you are honest to the Court and you are honest to your client and you are honest to the people, your integrity, sometimes good faith transcends all of this. You get another chance."

However, as the Trustee maintained, Byman Furniture *was* hurt by the delays caused by errors in the initial filing. The schedules, disclosure statement and plan all needed to be redone by Ms. Mobley. Two years after the filing, the plan is still awaiting confirmation. While it may be difficult to quantify the harm suffered by the Debtor by this delay, it is not difficult to determine that except for obtaining the benefits of the automatic stay, Mr. Acker's work was not a positive factor in the reorganization of the Debtor.

The third argument of the Trustee is the failure of Mr. Acker to obtain court authorization to serve as attorney for the Debtor. Mr. Acker's unfamiliarity with the requirements of the Code and Rules was no doubt directly responsible for his failure to re-quest authorization from the Court under § 327 of the Bankruptcy Code to serve as the attorney for Byman. However, Judge Schultz of this Court previously ruled in the *In re James Sierra & Co., Inc.* case, No. 79–00875–HS (S.D.Tex.) (Docketed 1/30/81) that lack of experience by counsel does not excuse compliance with § 327. *Sierra* held that a bankruptcy court may not award compensation to an attorney who has not met the § 327 requirements. The Court need not go further to determine that Mr. Acker is not entitled to any attorney's fees. Thus, the Court does not reach the Trustee's final argument regarding specificity of time records.

Counsel for the Trustee is to present an Order in conformity with this Memorandum Opinion within five days.