### In re A. Herbert RIVERS, Debtor.

### Bankruptcy No. 92–76814.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

April 13, 1994.

As Corrected June 2, 1994.

Hirsch Friedman and William Charles Grosse, Marietta, GA, for debtor.

Robert B. Silliman of Awtrey & Parker, Marietta, GA, Chapter 11 Trustee.

Guy Gephardt and Heide Feinman, Atlanta, GA, from U.S. Trustee's Office.

### DECISION AND ORDER DENYING AP-PLICATION OF DEBTOR'S COUN-SEL FOR COMPENSATION

JAMES E. MASSEY, Bankruptcy Judge.

The Chapter 11 Trustee and the United States Trustee object to the fee application of the attorney representing the Chapter 11 debtor in possession in this case on several grounds, the most serious of which question that attorney's integrity and professionalism. Regrettably, part of their objection is meritorious.

On January 5, 1994, the court held a hearing on the fee application and the objections. The court previously postponed hearings on the application and the objections at counsel's request because he had conflicts in other courts. After hearing some evidence on January 5, the court adjourned the hearing until January 26, 1994, to give Debtor's counsel additional time to respond to the details of the objections to allowance of compensation, even though Debtor's counsel had been for some time aware of the general nature of the objections. The court has considered the evidence introduced at the hearings, including the testimony of witnesses and the arguments of counsel, as well as the record in this Chapter 11 case, including pleadings filed by the Debtor. Based on that evidence and record, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

A. *Rivers' Pre–Bankruptcy Law Practice and Financial Problems.*

A. Herbert Rivers, the Debtor in this case, ("Rivers" or the "Debtor") is an attorney who has practiced in Georgia since 1969. He specializes in criminal and personal injury law but has never done bankruptcy work. Hirsch Friedman ("Friedman"), court-approved counsel for Rivers, and William Charles Grosse ("Grosse"), an associate attorney in Friedman's office, prepared and signed Rivers' proposed disclosure statements filed on April 5, 1993 and amended on July 9, 1993. The disclosure statements provide some information regarding the law practice of Rivers leading up to the filing of the petition initiating this case. The disclosure statements state that Rivers ceased being the Solicitor of Cobb County, Georgia in 1985 and entered private practice. He is said to have expanded his practice by opening two offices in metro Atlanta as well as several other offices in north Georgia and that he took out yellow page advertising in numerous telephone books and incurred approximately $70,000 in advertising debt. According to the disclosure statements, deteriorating economic conditions prevented the Debtor's practice from remaining profitable.

The amended disclosure statement discusses the reasons that Rivers filed bankruptcy, including problems arising from Rivers' reliance on yellow page advertising to sustain his legal practice and his inability to pay the advertising bills in 1992. It states that the primary catalyst for the filing of the Chapter 11 case was a law suit brought against him by Ad'Maginations, Inc., which was the broker Rivers used to obtain yellow page advertising.

The disclosure statements imply that Rivers incorporated his sole proprietorship in January 1992 and thereafter expanded his practice to include not only criminal defense matters but also "domestic matters, personal injury claims, and other civil matters." The amended disclosure statement also states that at the time of the incorporation, Rivers reduced the amount of advertising expense and "renegotiated the advertising contacts (sic) in the books he retained, and broadened the areas of law in which he practices." At the January 5 hearing, Friedman indicated that Rivers had not used his professional corporation until after he consulted Friedman about filing bankruptcy.

B. *The Commencement of This Case and Engagement of Friedman.*

The Debtor filed a petition initiating this case on October 15, 1992. The motion to employ counsel filed by Friedman on the Debtor's behalf on October 15, 1992, stated succinctly that the Debtor required counsel, that counsel would prepare necessary papers and documents and give advice regarding the case, that counsel held no interest adverse to the estate, that the applicant was competent to represent the Debtor and that "[s]aid attorney proposes to charge the Debtor, and be paid out of the estate, the sum of $150.00 per hour for services provided as an attorney at law, subject to court approval, plus any costs or expenses reasonably incurred by him." On October 20, 1993, the court entered an order prepared by Friedman granting the motion to employ Friedman as counsel to the Debtor, subject to objection by the United States Trustee filed within twenty days of the entry of the order.

On November 3, 1992, the United States Trustee filed comments on the motion to employ counsel and objected to the motion essentially on the ground that the application failed to provide sufficient information to comply with the Bankruptcy Code and Rules. On November 10, 1992, Friedman & Associates, P.C. filed a pleading styled "Amendment to Debtor's Motion to Employ Counsel," which apparently satisfied the concerns of the United States Trustee.

### C. *Rivers' Lack of Competency as a Chapter 11 Debtor in Possession.*

Friedman stated at the January 5 hearing that Rivers has a "permanent disability" as a result of an automobile accident that occurred over twenty years ago. As a result of the accident, Rivers suffers from a memory loss disorder which adversely affected his ability to conduct his financial affairs during all relevant periods. Rivers could easily be influenced by others regarding his financial affairs and was incapable of making independent judgments regarding his financial affairs both prior to and during this Chapter 11 case.

At the time of the filing of his petition, Rivers was heavily indebted to the Internal Revenue Service for back taxes. He was in arrears on the note secured by his residence. Rivers faced the prospect of being unable to place any yellow page advertisements for the following year, a very unpleasant prospect because he was heavily dependent upon yellow page advertising as a source of clientele. As a result of these pressures, Rivers was vulnerable, open to the power of suggestion and easily manipulated.

Friedman described Rivers' financial dilemma in terms that underscored the importance to Rivers of his obtaining yellow page advertising:

> Mr. Rivers's entire life, his ability to be able to operate his practice, is based upon ads that he had in the telephone directory. The telephone company would take no further ads, cash or otherwise, outside of him being in a reorganization.

(Tr. of 1/5/94, at 18.)

Friedman explained Rivers' memory problem to the court as follows:

In this particular case, Mr. Rivers is probably, the Rivers case and one or two other cases we've had in the past two years, are the most difficult cases we've had, because of the people involved. In Mr. River's case, as his secretary testified, this gentlemen could not remember things that we had discussed from one day literally to the afternoon. It was a very tragic situation, because of the fact that I liked Mr. Rivers.

. . . . .

Mr. Rivers couldn't remember, or says he couldn't remember, transactions relating to real estate, transactions between other family members, and it became to the point where we were no longer shocked, because we were already numb from some of the things that would come out in the record that other people knew, since we were strangers in Mr. River's life in general, other than knowing him as an attorney.

. . . . .

Repeatedly, over and over again, try as you might, he couldn't remember literally on Tuesday when we sent him out of our office to go to a bank to get a DIP account on Monday.

I have an extremely good relationship with Metro Bank. I represent the chairman of the board of directors of that bank. I sent Herb Rivers out of my office with a note: Please open up a DIP account for this man as a special favor for me. Herb lost the note by the time he got to his office across the street. I called the bank. I sent Herb there. Herb forgot the address. Short of our getting into a car and taking him there, we never would have done anything with Metro Bank.

(Tr. of 1/5/94, at 92–95.)

In short, Rivers lacked the competence needed to make financial decisions that a Chapter 11 debtor is called upon to make. In attempting to deflect the charges made by Rivers about Friedman's conduct, Friedman* admitted that Rivers was not competent to be a Chapter 11 debtor when he told the court:

I respectfully believe and still believe that a fiduciary should have helped run the

man's business. That's what a fiduciary should have done.

(Tr. of 1/5/94, at 95.)

That Rivers suffered memory lapses and was easily influenced in the high-pressure situation in which he found himself is not to say that Rivers' memory is completely unreliable or that he was not truthful. The witnesses at the January 1994 hearings were sequestered. Yet, other witnesses and evidence corroborated much of Rivers' testimony.

### D. Rivers' Failure to File Reports and the Improbability of Getting a Plan Confirmed.

Rivers filed no monthly report of operations until April 2, 1993, almost six months after the case began, when he filed five reports, one for each month from October 1992 through February 1993. The Debtor filed the reports only after the United States Trustee moved to convert or dismiss the case. Thereafter Rivers never filed another monthly report.

The few reports filed show that the Debtor failed to open a DIP account and reveal absolutely nothing about the Debtor's business. There is no evidence that counsel for the Debtor made any effort to educate the Debtor on his obligations with regard to business, in addition to personal, financial disclosures. Only after the United States Trustee objected to the initial disclosure statement did counsel for the Debtor finally recognize, to some extent, the need for disclosure of financial information about the Debtor's business by attaching to the amended disclosure statement a balance sheet and a four month operating report concerning the professional corporation.

The information provided in the reports and amended disclosure statement do not show sufficient net income to make it likely that the Debtor's plan could have been confirmed. Counsel for the Debtor introduced no evidence at the January 1994 hearings that showed that the Debtor had a reasonable prospect of getting a plan confirmed.

### E. The Placement of Yellow Page Advertisements and Referrals.

Friedman's time records attached to the fee application provide details regarding his role in the placement of yellow page advertising. On October 20, 1992, Friedman discussed with Rivers by telephone the yellow pages cancellation and had a telephone conference with Joe Davis of Southern Bell Advertising "to negotiate past due account and to arrange for future advertising in lieu of cancellation notice." On November 6, 1992, Friedman followed up with telephone calls and discussed the yellow page advertising problem with Rivers. On December 23, 1992, Friedman met with Rivers "to discuss a payment plan for yellow pages" and had a "telephone conference with yellow pages to schedule meeting for ad placement for 1993." On January 1, 1993, Friedman reviewed a letter from J. Strongwater, an attorney for Southern Bell, regarding advertising and the method of payment. On February 5, 1993, Friedman had a telephone conference with Strongwater to set up an appointment regarding yellow pages. On February 11, 1993, Friedman had a telephone conference with Rivers regarding a meeting with yellow page representatives relating to the advertising dispute. On that same date, Friedman met with Rivers and "yellow page executive to discuss advertising dispute and settlement of current year's advertising program."

At the hearing on January 26, 1994, the United States Trustee introduced as United States Trustee Exhibits C and D, copies of 1992 and 1993 yellow page advertisements placed by Rivers concerning his law practice. Exhibit C, the 1992 ad, is captioned in large type "INJURED?" and describes various circumstances in which tort claims might arise such as "auto accident," "slip and fall" or "malpractice." Below icons illustrating various types of tort claims, that ad also states in capital letters "DUI & DRUG DEFENSE" and "ON THE JOB INJURIES." Exhibit D, the 1993 ad, is captioned "NEED LEGAL HELP?" and contains the same list of tort claims and accompanying icons. In this ad, however, the words "WORKERS' COMPENSATION," "D.U.I." and "BANKRUPTCY" appear in capital letters below the icons.

Friedman helped to design the 1993 ad, which was published in April 1993, but had nothing to do with the 1992 ad. Friedman persuaded Rivers to include the word bankruptcy in the 1993 ad, as a part of a scheme to have Rivers refer bankruptcy clients attracted by the ad to Friedman.

Friedman prepared an agreement dated June 3, 1993, between his professional corporation and A. Herbert Rivers, P.C., which he and Rivers executed in early June, 1993. The agreement, introduced as United States Trustee's Exhibit B, provides for Rivers to perform services on behalf of clients of Friedman and to act as a limited associate of Friedman's law firm. The agreement goes on to state:

It is expressly understood that in the practice of bankruptcy law it is necessary to make either a seperate (sic) disclosure of any outside firms working on a bankruptcy matter of any person or firm that is not an associate or of counsel generally to said firm. Accordingly, the parties have entered into this agreement so that fees received by Friedman may be distributed by the parties herein according to the respective work done thereby in compliance with the applicable provisions if (sic) law in general as relates to associates and members of law firms that are 'of counsel'.

The agreement was part of the arrangement devised by Friedman pursuant to which Rivers would refer to Friedman telephone inquiries about bankruptcy representation made in response to Rivers' yellow page advertisement. Rivers' paralegal, Kimberly Jane Smith, kept a list of the names and telephone numbers of the persons who made inquiries regarding bankruptcy counseling; that list was introduced into evidence as United States Trustee's Exhibit E. At Rivers' direction, Smith telephoned Friedman's office from time to time in June and July 1993 and referred those persons to Friedman's office.

Friedman introduced Friedman Exhibit 1, a letter that he contends he sent to Rivers dated May 31, 1993, enclosing the agreement that was marked as United States Trustee's Exhibit B and a document entitled "Motion and Supplemental Disclosure." Friedman stated in his place that Rivers had requested the opportunity to perform services for Friedman at section 341 meetings and that he drafted the agreement to comply with a court order that required attorneys appearing at first meetings of creditors to be counsel to the firm or attorney primarily responsible for representing the debtor. He further stated that he had taken no action with regard to the agreement because he had not obtained court approval.

Friedman called his secretary, Sandra Williams, to testify regarding telephone calls from Rivers' office about bankruptcy leads. Rather than supporting Friedman's contention that he had discouraged Rivers from referring clients, Williams essentially confirmed Rivers' and Smith's testimony:

Q And what did you do when they called up?

A Just wrote the names down.

Q And do you know what happened after the names were written down?

A That our paralegal would follow up.

Q Did he call anybody up as far as you know?

A Not that I know of. I just made the list and gave it to the bankruptcy paralegal.

Q Okay. And do you know what they did with it?

A I don't know.

Q Do you know which paralegal it was?

A I'm sorry, I don't.

(Tr. of 1/26/94, at 126.)

There is no evidence that Friedman ever represented any of the persons referred by Rivers' office whose names appear on the list.

Neither Friedman's testimony regarding the purpose of the agreement nor his testimony regarding Rivers' desire to begin the practice of bankruptcy law is credible. Rivers had never practiced bankruptcy law before the yellow pages ad was placed and has not done so since. If Friedman had intended to use Rivers to cover section 341 hearings, it was only in connection with the benefits to be derived from the referrals of bankruptcy cases in areas reached by Rivers' 1993 yellow

page ad. On January 5, 1994, Friedman cross-examined Rivers about the referral and stated, "The fact is, I told you not to make telephone calls until the court approved. Do you recall that, Mr. Rivers." Rivers replied, "No, sir. I don't." Neither the unfiled motion nor the agreement between the professional corporations mentions referrals by Rivers to Friedman. That Friedman would state to Rivers as a fact that referrals required court approval showed that the agreement and the referrals were part of the same scheme.

In responding to the general allegation in the United States Trustee's objection to the fee application to the effect that an undisclosed change in the relationship between counsel and Rivers had occurred, Friedman brought to the court's attention that he had undertaken to represent a client of Rivers during the Chapter 11 case. That client was one Joseph Braddy, who, Friedman stated, had discharged Rivers as his counsel in a personal injury case. At the January 5 hearing, the following colloquy between the court and Friedman occurred:

THE COURT: Let me see if I understand what you're telling me, that Mr. Rivers's business while he was in his Chapter 11 case, was a law practice and he continued to operate that law practice in the Chapter 11 case?

MR. FRIEDMAN: That's correct.

THE COURT: And two of his assets were personal injury cases, and in one situation, the client, for whatever reason, went somewhere else, and the other situation, his client was in need of bankruptcy relief, and so your firm represented that client, and you also represented that client in the personal injury case?

MR. FRIEDMAN: That is correct. After the client had already resigned from Mr. Rivers, with Mr. Rivers knowledge.

THE COURT: You don't think that's a conflict of interest?

MR. FRIEDMAN: I did not think so, Your Honor.

(Tr. of 1/5/94, at 22.)

At the continuation of the hearing on January 26, Friedman introduced as Friedman Exhibit 3 a copy of a letter from Braddy to Rivers dated July 1, 1993, in which Braddy fired Rivers. Friedman explained his representation of Braddy at that time as follows:

He had already been—he had already released Mr. Rivers without knowing us. He had no relationship with Mr. Rivers at that time. There was no money due between either party. When he asked us to represent him—I'm trying to recall who first, because I believe he spoke to Karen Maxie in our office. Our office agreed to do a Chapter Thirteen proceeding for the man. Mr. Rivers did not do any bankruptcy case for him. He had had a personal injury matter which he had not filed any type of suit for. The man was a truck driver and was in severe financial straits. Mr. Rivers was not named as a creditor. Mr. Rivers had no claim, and I thought about it, and I could not see any potential conflict involved because no claim was being made.

(Tr. of 1/26/94, at 16.) The July 1, 1993 letter, purportedly signed by Braddy, states that Rivers had not returned phone calls "since the latter part of June, 1993" and that Braddy believed it would be in his best interest to try to settle the matter himself. The court takes judicial notice of the fact that a mere four weeks later on July 30, 1993, Friedman's firm filed Braddy's Chapter 13 case under case no. 93–70797. Friedman also had contact with another client of Rivers. Friedman stated that that client declined to continue using Rivers but that he "tried to keep the case" for Rivers.

F. *Alleged Unauthorized Postpetition Payments To Friedman.*

The charge that Friedman engaged in improper behavior by obtaining referrals from the Debtor is not the only serious ground advanced by the Chapter 11 Trustee and the United States Trustee for denying the fee application. They also contend that Friedman demanded and obtained payments from the Debtor for fees without court approval in violation of 11 U.S.C. § 330.

Rivers testified that on several occasions after the case was filed, Friedman demanded that Rivers pay a "trustee's fee", legal fees and payments to settle a lawsuit. Rivers

said that Friedman instructed him to make the payments in cash. He testified that he made payments to Friedman on several occasions and that the payments were regularly $500 per month in cash and in larger amounts on two or three other occasions. Rivers also testified that on occasion, his secretary delivered cash to Friedman's office. Rivers kept no record of such payments allegedly made to Friedman and obtained no receipts.

On several occasions during the pendency of this case, Rivers told Smith that he was going to Friedman's office to make a payment to Friedman. On a few occasions she received telephone calls from persons in Friedman's office asking that Rivers come to Friedman's office to make a payment. Smith's testimony corroborated Rivers' testimony that he was asked to bring money to Friedman.

The objecting parties presented no evidence regarding checks that Rivers claimed to have cashed in order to make cash payments to Friedman or accounting records that might have corroborated his testimony. Moreover, not every recollection of Rivers was accurate. Contrary to Rivers' testimony, Smith stated she did not take a payment to Friedman's office. Rivers admitted on cross-examination regarding cash payments that his memory was faulty. Smith also testified that Rivers' memory is flawed and that he often cannot remember something from one day to the next. On cross-examination, Rivers sometimes gave confused and contradictory testimony regarding the source of cash that he said he gave to Friedman. Although he consistently maintained that he made such payments, his contention that he gave Friedman cash was undermined by his inability to remember details. Friedman knew that Rivers was, in Friedman's words, "operating out of his pocket," but Friedman denied receiving cash payments from Rivers.

In early July 1993, Rivers delivered to Friedman's office check no. 1634, dated July 2, 1993, drawn on an account of A. Herbert Rivers, P.C. in the amount of $1,500. The check was deposited into the operating account of Friedman & Associates, P.C. on July 2, 1993. Rivers testified that he gave the check to Friedman in response to a demand for legal fees. Smith recalled the check Rivers asked her to give him to pay Friedman. Rivers made out the check himself and later told Smith to record the check as a legal fee, which is the notation she made on the check register.

Friedman contends the check related to a settlement with Ad'Maginations, the broker for yellow page advertising that sued Rivers in 1992 in a state court. After the filing of the Chapter 11 case, Friedman filed a motion to remove that case to this court. The claim of Ad'Maginations is a general unsecured claim. Nonetheless, for no reason offered other than to get the attorney for the creditor "out of our hair," Friedman negotiated a settlement of that claim, outside of the proposed plan, pursuant to which Rivers would pay $7,700 in satisfaction of the claim during the pendency of the Chapter 11 case.

At the January 5 hearing Friedman asked Rivers, "The fifteen hundred dollar payment, exhibit by check number, Exhibit UST, you don't know that that went to Jack Goger for the Ad–Imaginations (sic) settlement that is presently pending before this court?" (Tr. of 1/5/94, at 53). Later Friedman asked Rivers, "The fact is, Mr. Rivers, the check that you wrote on July 21, 1993, was for the initial payment to Jack Goger?" Rivers responded "I don't know. I don't know. I thought it was to you for part of the fee." (Tr. of 1/5/94, at 54–55). Although Friedman's questions were not the equivalent of sworn testimony by him, they show that on January 5, he wanted the court to believe that the $1,500 was the downpayment on the settlement that later changed to monthly payments of $1,100.

In correspondence to the United States Trustee dated January 14, 1994, admitted as Friedman Exhibit 4, the attorney for Ad'Maginations stated that Friedman initially proposed a compromise of the claim in the amount of $7,500. The attorney, John J. Goger, then wrote in the second paragraph of that letter:

> Sometime thereafter, it appeared that Rivers would never be able to pay more than $7,500 to settle the claims. Accordingly, Friedman renewed his proposal but it was again rejected. I believe that as a

condition to accepting his proposal I had insisted upon the payment of $1,500 at the time the settlement agreement was reached. Friedman countered by increasing the amount of the settlement to $7,700 payable in equal monthly installments of $1,100. The first such installment was due and payable on June 1, 1993.

At the beginning of the January 26 hearing, Friedman stated to the court:

Mr. Goger's letter acknowledges that we had discussed settlement, that it had gone on and off, that he insisted—and I'm reading from paragraph two of his letter—that this has been stipulated by the U.S. Trustee's office and ourselves, that there was to be a Fifteen Hundred Dollar initial payment and the six One Thousand Dollar— I'm sorry, five One Thousand Dollar payments—six One Thousand Dollar payments, thereafter, for a total of Seventy-five Hundred Dollars.

(Tr. of 1/26/94, at 5). Friedman's reading of Mr. Goger's letter and the court's reading differ. Friedman's contention that a deal had been reached calling for a payment of $1,500 is plainly contradicted by Goger's letter.

A joint pleading styled "Application to Compromise Controversy" filed by the parties on June 16, 1993, two weeks before Rivers delivered the $1,500 check to Friedman, described the agreement outlined in Mr. Goger's letter: seven payments of $1,100 each. The Application stated that counsel for the creditor would hold the payments in escrow pending court approval. An accounting attached to Friedman Exhibit 4 reflects deposits of two payments of $1,100 in an account of the creditor's counsel on June 15 and July 8, 1993.

Smith obtained a cashier's check for $1,100 payable to "AD. MAGINATIONS" dated June 4, 1993, a copy of which was admitted as Chapter 11 Trustee's Exhibit 2. She testified that Grosse called her on June 4, 1993, to ask for this check. Grosse denied that he had spoken with Ms. Smith or that he had anything to do with payment of settlement funds. At the conclusion of the hearing on January 26, Friedman stated that "no payments got to Mr. Goger from us."

At the beginning of the January 26, 1994, hearing Friedman stated in his place that Rivers brought the $1,500 check by Friedman's office when Friedman was not there. He said that his secretary turned the check over to the firm's accountant. Friedman's secretary testified that Rivers delivered the check in response to a letter and phone calls that Friedman's office made to Rivers requesting a $1,500 check. She thought Rivers was being asked to bring in funds for "the Trustee," but she wasn't sure. She testified that the check was not a fee because it was supposed to go into the firm's escrow account. Nonetheless, her response that she was not sure of the purpose of the check coupled with the failure of Friedman to introduce the letter that might have clarified the purpose of the check suggests that her conclusion that the check was not for a fee was merely speculative.

Friedman stated in his place that he had employed a new accountant shortly before Rivers delivered the $1,500 check, that the accountant had mistakenly deposited the check in the firm's general account with a credit to a client with a similar name and that the error had not been discovered until 5:00 A.M. on January 26, 1994.

Friedman's office did not accept escrow checks from Chapter 11 debtors and he was clear that his office was not a conduit of settlement funds from Goger. No agreement had been reached that would have required a $1,500 payment. The parties reached an agreement prior to June 4, 1993, the date on which Ms. Smith obtained a bank check for $1,100, which required a monthly payment of $1,100. Friedman's explanation that the check had been credited by mistake to another client named Rivers was not credible. The $1,500 check was a payment of a fee to Friedman.

G. *The Appointment of a Chapter 11 Trustee.*

As discussed below, Friedman caused the Debtor to initiate an adversary proceeding against the professional corporation of the Debtor's former attorney and accountant, Robert Autrey, to recover alleged preferen-

tial transfers (the "Autrey Adversary Proceeding"). Autrey's professional corporation filed a counterclaim against the Debtor and the Debtor's professional corporation and moved to dismiss the main case or to appoint a trustee. Judge Drake conducted a hearing on that motion on July 28, 1993, and entered an order on August 4, 1993, directing the appointment of a trustee. Thereafter, the United States Trustee appointed Robert B. Silliman as Chapter 11 Trustee for the estate of the Debtor and the court approved that appointment.

### H. *The Fee Application.*

On September 30, 1993, Friedman filed an application for compensation in which he sought $14,325.00 for fees and $230.60 for reimbursement expenses, "less $3,500.00 already received." The application fails to describe the nature of the services but refers to time records attached to the application. In addition to interviews with the Debtor and routine matters such as attending the first meeting of creditors, the time records reflect activities in the following general categories: meetings and preparation of correspondence and pleadings relating to an alleged claim of the Debtor against the Debtor's former attorney and accountant, Robert Autrey; meetings with the Debtor and others to review and obtain yellow page advertising; meetings and document preparation regarding the claim of Ad'Maginations, Inc.; meetings and telephone conferences regarding the United States Trustee's motion to dismiss for failure to file monthly finance reports; telephone conferences regarding refinancing of Debtor's home; drafting of a plan and a disclosure statement and amendments; telephone conferences and related matters relating to refinancing an automobile; telephone conferences concerning investigation of Georgia Department of Labor involving the Debtor; and telephone conferences with the Chapter 11 Trustee.

### I. *Other Objections.*

The United States Trustee objected to the fee application on the ground that a charge of $175 per hour for the time of three-year associate Grosse was excessive. The motion Friedman filed seeking approval of this employment as counsel to the Chapter 11 debtor mentioned only one hourly rate of $150 per hour. Friedman sought $200 per hour for his time. Friedman introduced no evidence showing why the rate stated in the motion seeking an order approving his appointment had changed. Grosse has practiced law for approximately three years. The market rate in Atlanta, Georgia for an associate for three years' experience, whether in bankruptcy or in other disciplines, is about $105 per hour.

The United States Trustee also objected to various specified time entries which the Trustee viewed as excessive or otherwise unreasonable. These were resolved at the hearing by Friedman's withdrawal of any request for compensation as to those services.

The Chapter 11 Trustee's other major objections were that the Autrey Adversary Proceeding against the Debtor's former attorney and accountant was unnecessary and did not benefit the Debtor or the estate and that the filing of the Chapter 11 proceeding itself was unnecessary in the first place.

At the hearings in January, 1994, the Chapter 11 Trustee argued that the court should not approve compensation for work done on the Autrey Adversary Proceeding because the claim in that case had no value to the estate. Friedman countered that assertion by arguing that Rivers was easily manipulated and that Autrey controlled Rivers with respect to financial matters. Based on that argument, Friedman contended that Autrey was an insider, thereby expanding the preference period to one year. Friedman called his associate, Grosse, to testify regarding their theory of that case. Grosse agreed with Friedman that Rivers was a "controllable person" and stated that Rivers is "easily persuaded."

### *DISCUSSION*

The application for approval of attorney's fees and reimbursement of expenses and the objections to it raise several interconnected issues concerning the duties of an attorney for an incompetent debtor in possession, the business relationship of Friedman and the Debtor and the effect of that relationship on

the statutory requirement that a court-approved professional be a disinterested person, and the value and necessity of work performed by Friedman and his colleagues. The objections to the award of compensation fall into two primary categories: (1) the contention that the application should be denied because Friedman's conduct was improper, causing him to be an insider and not a disinterested person and (2) the contention that the services rendered had no value to the estate. For the reasons given below, the court denies Friedman's application for compensation and orders him to return to Rivers the prepetition retainer in the amount of $3,500 and the postpetition payment of $1,500.

### A. *The Duty of an Attorney for an Incompetent Debtor in Possession.*

The analysis of the conduct of the Chapter 11 Debtor's attorney and of the effect of that conduct on compensation begins with the obligations of the Debtor himself. Pursuant to section 1107 of the Bankruptcy Code, a debtor in possession in a chapter 11 case has "all the rights ... and powers" and "shall perform all the functions and duties" of a trustee, with specified exceptions not relevant here. Because a debtor in possession is empowered to perform the duties of a trustee, a debtor in possession is a fiduciary, *In re DN Associates,* 144 B.R. 195, 199 (Bankr. D.Me.1992), as is the attorney for the debtor in possession. *In re Doors and More, Inc.,* 126 B.R. 43, 45 (Bankr.E.D.Mich.1991). The relevant duties entrusted to a debtor in possession include being responsible for all property received, objecting to the allowance of an improper claim, filing periodic reports with the court, United States Trustee and governmental tax units, filing a plan, and operating the debtor's business. 11 U.S.C. §§ 704(2), (5) and (8); 1106(a)(1) and (6); and 1108. The nature of these duties implies that a debtor in possession, like a trustee, must possess the mental faculties, capacity to make decisions and judgment to carry out these duties.

Accepting representation of a fiduciary increases the weight of professional responsibility because the professional must take care that he or she is receiving valid instructions from a competent fiduciary acting within the scope of the fiduciary's trust. Although the line separating advice or assistance in performing duties from the actual performance of those duties is not always bright, the line exists, and a professional has no business making decisions that are the responsibility of the fiduciary. If a debtor is unable to perform the duties of a debtor in possession, the court, on proper motion, will appoint a trustee. In such a case, appointment of a trustee is mandatory under section 1104 of the Bankruptcy Code, which states in relevant part that the bankruptcy court "*shall* order the appointment of a trustee— (1) for cause, including ... incompetence ...." (Emphasis added.) Advice to a Chapter 11 debtor easily manipulated and hence unfit to perform his duties is control rather than guidance. To continue giving such "advice" is to usurp authority not the professional's to exercise.

A. Herbert Rivers required a fiduciary. Friedman himself spontaneously volunteered that fact. If a debtor in possession is incompetent, it should be apparent that reorganization is unlikely, if not impossible, and it is the duty of a court-appointed professional to bring that fact to the attention of the United States Trustee and the court. *In re James Contracting Group, Inc.,* 120 B.R. 868, 873–74 (Bankr.N.D.Ohio 1990). The breach of that duty alone is a ground for denial of compensation.

### B. *Friedman's Adverse Interest and Insider Role.*

Under section 327 of the Bankruptcy Code, a trustee, with court approval, may employ an attorney who does not "hold or represent an interest adverse to the estate" and who is "disinterested" to represent or assist the trustee in carrying out the trustee's duties. Congress was not content merely to require that a professional be disinterested and not hold an adverse interest to the estate at the time of employment of that professional. The Bankruptcy Code empowers the court to deny compensation to a professional who is not disinterested or who holds an interest adverse to the estate "at any time during

such professional person's employment under § 327." 11 U.S.C. § 328(c).

The Bankruptcy Code defines a "disinterested person" in section 101(14) as one who is not an insider and "who does not have an interest materially adverse to the interests of the estate or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in the debtor ... or for any other reason." Section 101(31) defines "insider" as including specified categories of persons with close contact with the debtor. The word "including" is not limiting. 11 U.S.C. § 102(3). "An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." H.R. No. 95–595, 95th Cong. 1st Sess., p. 312 (1977), 1978 U.S. Code Cong. & Admin. News pp. 5787, 6269.

Against this statutory backdrop, the case law has defined the boundaries of proper professional conduct. The facts of this case require no extension or adjustment of those boundaries. Although the precise nature and details of professional conduct in this case are unusual, the application of the law to the facts is routine.

An interest that is "adverse to the estate" within the meaning of section 327 includes one "that would tend to lessen the value of the bankruptcy estate or that would create an actual or potential dispute in which the estate is a rival claimant." *In re Roberts*, 46 B.R. 815, 827 (Bankr.D.Utah 1985), *aff'd in part, rev'd in part*, 75 B.R. 402 (D.Utah 1987). *See also, In re Evirodyne Industries, Inc.*, 150 B.R. 1008 (Bankr.N.D.Ill.1993). According to some commentators and courts, a disinterested person is one free of the slightest hint of conflict which might impair the high degree of impartiality and detached judgment expected during the bankruptcy proceeding. 2 *Collier on Bankruptcy* ¶ 327.03 (15th ed. 1990), *see, e.g., In re Watson*, 94 B.R. 111, 116 (Bankr.S.D.Ohio 1988) (disinterested person should be divested of any scintilla of personal interest ...); *In re Lee*, 94 B.R. 172, 178 (Bankr.C.D.Cal.1988) ( [t]he unsanctioned representation of con-

flicting interests is on of the most serious sins that a lawyer can commit).

The role of a court-approved professional employed in a bankruptcy case is to "advise" and "assist" the fiduciary. The professional's duties run not merely to the person or persons holding the office of the fiduciary but to the trust to which the fiduciary owes allegiance. Thus, in a Chapter 11 case, an attorney for a debtor in possession must balance a role as counsellor to the debtor with the role of officer of the court and fiduciary to the bankruptcy estate. When the interests of the former conflict with those of the latter, it is the estate and the court to which the attorney owes his highest allegiance.

The unique circumstances which surround insolvency and the filing of a Chapter 11 case place the attorney for the debtor in possession in the unusual position of sometimes owing a higher duty to the estate and the bankruptcy court than to his client. In fact, the status of the client and the attorney may often overlap in a Chapter 11 case, as the debtor's attorney must take conceptual control of the case and provide guidance for management of the debtor, not only to discern what measures are necessary to achieve a successful reorganization, but to assure that, in so doing, compliance with the Bankruptcy Code and Rules is sought rather than avoided. Debtor's attorney's duty as fiduciary of the estate requires an active concern for the interests of the estate and its beneficiaries. *In re Consupak, Inc.*, 87 B.R. 529 (Bankr. N.D.Ill.1988).

*In re Whitney Place Partners*, 147 B.R. 619, 620–21 (Bankr.N.D.Ga.1992).

Friedman did not discharge his duty, and his dereliction was not due merely to ignorance or blunder. He knew that Rivers was incapable of managing a business. He knew Rivers had no professional assistance in basic bookkeeping. He knew or should have known that the income and expenses of the estate included not only what Rivers received in salary from his wholly owned professional corporation and what he spent personally, but also the gross income of the law practice and the operating expenses

of that practice. He knew that Rivers was not timely filing the reports required by section 704(8). He knew that Rivers was incapable of preparing those reports because he sent Grosse to gather financial information. He knew that Rivers was vulnerable to manipulation and control. He knew that Rivers was possessed with anxiety about the loss of yellow page advertisements and he knew that Rivers' practice depended in large measure on those advertisements. He knew Rivers had a disability that manifested itself in occasional memory loss. He knew or should have known by the end of 1992 that Rivers' net income was not sufficient to permit a plan to be confirmed. He knew that Rivers had difficulties with at least two clients who wanted to fire Rivers and seek other counsel. He knew that Rivers was a "controllable person."

From the beginning of the case, Friedman exercised effective control over important business and legal matters of the estate. In so doing, he effectively determined the scope of work he would perform and the cost of the services he purported to render. Knowing that Rivers had not and would not practice bankruptcy law, Friedman conceived a scheme to enrich himself using an advertisement designed to mislead the public and paid for by property of this estate. If the ethical issue raised by the failure of the yellow pages ad to disclose that Rivers did not practice bankruptcy law could have been resolved, Rivers might have made legitimate referrals to other lawyers. *See*, State Bar of Georgia Formal Advisory Opinion No. 92–2, issued July 30, 1992. Attorneys and other professionals take into account referrals from other professionals in deciding where to refer clients. If the ethical problem could not be solved, it would have been in Rivers' best interest not to refer any potential client. Either way, Friedman's interest in generating clients for himself was in direct conflict with the interests of the estate.

Similarly, in undertaking to represent an allegedly dissatisfied client of Rivers, not just in a bankruptcy case, but in the personal injury matter on which Rivers had been employed, Friedman's own interest in generating fees was singularly adverse to the interests of the estate in the matters on which he was engaged. It is no defense to contend, as Friedman did, that Rivers had no claim against the client in connection with the personal injury case or that the client had severed all ties with Rivers. There is no way to know whether the Braddy representation might have been preserved for Rivers. There is no way to know whether work done by Rivers might have formed the basis for a claim against Braddy. There is no way to know whether Rivers might have negotiated a part, however modest, of the contingent fee taken by Friedman for work that Rivers did. Friedman undertook to resolve unilaterally all issues of the interests of Rivers and his estate in favor of Friedman.

 The responsibility of resolving any serious issue concerning a possible conflict falls on the bankruptcy court and not on the attorney for a debtor in possession or trustee. When the attorney undertakes to resolve the issue and does so incorrectly and continues to influence the fiduciary on matters involving the adverse interest, there is an inordinate potential for injury to the estate. One of the hallmarks of the Bankruptcy Code is the policy of full disclosure of relationships. That policy is designed precisely for the purpose of avoiding injury from conflicts of interest that might occur in the absence of disclosure of relationships and that would be difficult to detect. The policy of full disclosure protects not just the estate itself, but the bankruptcy process as well. Unethical conduct by a fiduciary in a bankruptcy case damages the public's confidence in judicially supervised reorganizations, whether or not there is actual damage to the estate. Denial of compensation is an appropriate deterrent to such conduct.

 Not only was Friedman's conduct in violation of the disinterestedness requirement of the Bankruptcy Code, it also breached the standards of ethics and professionalism found in the Georgia Code of Professional Responsibility. *See, e.g.*, State Bar of Georgia Code of Professional Responsibility EC 5–1; EC 5–2; EC 5–3; DR 5–101.[1]

1. EC 5–1 The professional judgment of a lawyer should be exercised, within the bounds of the

Business transactions between an attorney and a client, particularly where the client expects the lawyer to provide impartial advice, are ethical mine fields. An attorney may enter into such arrangements only if the client is fully informed, the transaction is fair and reasonable to the client, and the client consents. State Bar of Georgia Code of Professional Responsibility DR 5-104.[2] A business transaction between the debtor in possession or trustee and his attorney can never be in the ordinary course of the business of the estate. Hence, the fiduciary can never authorize such a transaction without court approval. 11 U.S.C. § 363. When the debtor is easily persuaded and controllable and the attorney for the debtor uses his influence over the debtor to obtain a financial advantage, it is ludicrous to think that any unapproved business relationship between the debtor in possession and the attorney for that fiduciary is bona fide.

In *Babylon Cove Marine, Inc. v. Hanse (In re Babylon Cove Marine, Inc.)*, 69 B.R. 23 (Bankr.E.D.N.Y.1986), the court vacated an order authorizing the employment of debtor's attorneys, when it discovered that debtor's attorneys were major shareholders in a corporation established for the purpose of purchasing property of the debtor. The court concluded that the attorneys could not purge themselves from the conflict by obtaining the consent of the debtor, since in a Chapter 11 the true client was the "debtor in possession." As such the attorney answered not only to the debtor, but also to the body of creditors. The interest of the attorneys was adverse, because the better the deal for the attorneys, the less money available to the creditors of the estate. *Babylon Cove*, 69 B.R. at 25.

Similarly in *Tigue v. Steger (In re Tigue)*, 82 B.R. 724 (Bankr.E.D.Pa.1988), the court condemned the actions of an attorney who purchased his client's property at a foreclosure sale. The attorney had obtained consent from the debtor to purchase the property prior to the foreclosure, but the court found this to be egregious conduct because at the time the consent was obtained, the debtor was confined in the state mental hospital. The court rebuked the attorney, stating:

The Debtor's questionable mental competency at the time of executing the consent ... must have been obvious to the Defendant and were preyed upon by him. Given the Defendant's fiduciary duty of undivided loyalty to the Debtor arising out of the attorney-client relationship ... the Defendant's misrepresentations to his mentally-impaired client as a means of obtaining his approval to the assignments at a time when the Debtor's resistance was obviously weakened is nothing short of odious.

*Tigue*, 82 B.R. at 732. In sanctioning the attorney for his breach of duty, the court relied on a decision of the Supreme Court of Pennsylvania for the standard of business

law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interest, the interest of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client.

EC 5-2 A lawyer should not accept proffered employment if his personal interests or desires will, or there is a reasonable probability that they will, affect adversely the advice to be given or services to be rendered the prospective client. After accepting employment, a lawyer carefully should refrain from acquiring a property right or assuming a position that would tend to make his judgment less protective of the interests of his client.

EC 5-3 The self-interest of a lawyer resulting from his ownership of property in which his client also has an interest or which may affect property of his client may interfere with the exercise of free judgment on behalf of his client. If such interference would occur with respect to a prospective client, a lawyer should decline em-

ployment proffered by him. After accepting employment, a lawyer should not acquire property rights that would adversely affect his professional judgment in the representation of his client....

DR 5-101. *Refusing Employment When Interests of the Lawyer May Impair His Independent Professional Judgment.*

(A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

2. DR 5-104. *Limiting Business Relations with a Client.*

(A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

transactions between attorney and client. There the Supreme Court of Pennsylvania stated:

> That relation [attorney and client] is so confidential in its nature that it calls for the exercise of the most perfect good faith. In transactions between counsel and client, no shadow of anything like deception or unfair dealing upon part of an attorney can be countenanced. In every case in which complaint is made, the court will scrutinize the transaction with jealous care to see that there is no relaxation of the rule. Owing to confidence bestowed upon him, the attorney is presumed to be able to strongly influence his client; hence, the law often declares transactions between them void which between other persons would be unobjectionable. Unless the transaction is fair and conscionable, it is deemed a constructive fraud.

*Meara v. Hewitt*, 455 Pa. 132, 135–36, 314 A.2d 263, 265 (1974), quoting *Kribbs v. Jackson*, 387 Pa. 611, 621–622, 129 A.2d 490, 495 (1957). *See also, In re Hunt Intern. Resources Corp.*, 1992 WL 235580 (Bankr. N.D.Tex.1992) (the basic principles underlying the conflict of interest prohibition take on an added dimension when applied to those representing a bankruptcy estate. Concepts of client consent and waiver become difficult to apply when the client, the estate, is a fiduciary for another group, the creditor body).

By designing the yellow page ad, seeking referrals from the debtor, placing his own interest in representing a client of Rivers ahead of Rivers' interest in maintaining that representation and entering into an agreement with Debtor to involve Rivers in Friedman's law practice and thereby manipulating Rivers' law practice, Friedman violated the spirit and letter of the Bankruptcy Code, as well as of the Code of Professional Responsibility. He was an undisclosed insider holding secret interests adverse to the estate and had ceased to be a disinterested person, if he ever was one. One so insensitive to the "punctilio of an honor the most sensitive" forfeits all claim to compensation.[3]

## C. Alleged Unauthorized Postpetition Payments to Friedman.

It is elementary that a professional may not solicit or accept compensation from a fiduciary without prior court approval and that compensation may be awarded only after notice to parties in interest and a hearing. 11 U.S.C. § 330; Fed.R.Bankr.P. 2002(a)(7). The burden of proving that Friedman received an unauthorized cash payment was on the Chapter 11 Trustee and the United States Trustee.

Knowing that Rivers could not keep track of how much he was being asked to pay or why, Friedman and his office badgered Rivers for money. Friedman knew that Rivers was operating in the Chapter 11 case without records, which would make cash payments difficult if not impossible to verify, and provided Rivers with little, if any, written explanation about the need for payments. The evidence presented showed that Friedman received one fee payment from Rivers by check for which Friedman had failed to account prior to the January 1994 hearings and about which Friedman was less than candid. Taking a payment without court approval was improper conduct; taking that payment under the circumstances of this case was unconscionable and warrants denial of all compensation.

The United States Trustee and Chapter 11 Trustee adduced evidence showing that Friedman may have persuaded Rivers to make cash payments to him for which there is no accounting. Although Rivers was adamant that he had made cash payments to Friedman and the United States Trustee presented evidence, in addition to Rivers' own testimony, that indicated Friedman or his office called Rivers on several occasions about the need for Rivers to bring payments to Friedman's office, the amount of any such payment cannot be accurately determined. The evidence lacked sufficient weight to satisfy the court that the objecting parties met their burden with respect to cash payments.

---

**3.** *Meinhard v. Salmon*, 249 N.Y. 458, 464 164 N.E. 545 (1928). (Cardozo, C.J.)

### D. *The Quality and Value of the Representation.*

The court may award reasonable compensation for actual, necessary services based upon the nature, extent, and value of such services, the time spent and the cost of comparable services in the non-bankruptcy context. 11 U.S.C. § 330(a). In evaluating the reasonableness and necessity of such services, the court is guided by the principles set forth in *Norman v. Housing Authority of Montgomery,* 836 F.2d 1292 (11th Cir.1988), which include the oft-cited factors established in *Johnson v. Georgia Highway Exp., Inc.,* 488 F.2d 714 (5th Cir.1974). The bankruptcy courts in this circuit generally utilize the lodestar method for calculating fees by multiplying a reasonable hourly rate of the applicant by the amount of time reasonably necessary and expended by an attorney in the performance of his or her duties.

▮▮▮▮ Friedman has acceded to the United States Trustee's objections to specific time entries and to the rate charged by Grosse. The Chapter 11 Trustee objected to the fee application on the grounds that Rivers did not belong in Chapter 11 in the first place and that the Autrey Adversary Proceeding was not worthy of pursuit. These objections were more vigorously defended than pursued. Friedman called Grosse to testify about the Autrey case and the tax problems facing Rivers at the time the case was filed. The court is willing to give Friedman the benefit of any doubt about the need for a Chapter 11 case. There can be no doubt about the merits of the fee application with respect to the reasonableness of time expended and the quality of the work performed by Friedman and Grosse. The application reflects unnecessary time spent on unnecessary tasks to produce unnecessary pleadings of poor quality.

The complaint against Autrey barely stated a claim for relief under 11 U.S.C. § 547. The court attributes Autrey's motion to dismiss and ensuing litigation directly to the shoddy complaint. Although it is true that Judge Drake denied Autrey's motion for judgment on the pleadings, his order focused solely on the issue whether a transfer from a wholly owned corporation can constitute a preference, and he noted that the amount at stake was a mere $5,801.16. Friedman's time records show 8.3 hours for Grosse for whom Friedman sought to charge $175 per hour and 10 hours for himself at $200 per hour, for a total fee of $3,452.50, more than half of the recovery sought. Had Friedman continued the litigation of this case, there is little reason to believe that there would have been any net recovery for the estate.

Though less time was spent, no more can be said for the work done in connection with the claim of Ad'Maginations. Prior to the filing of the Chapter 11 case, that creditor sued Rivers in the State Court of Fulton County, Georgia to recover damages of $26,204. This claim was dischargeable. There appeared to be no reasonable basis for contesting the amount of the claim or for proposing to pay that creditor ahead of other creditors during the Chapter 11 case. The legal expenses generated in settling this claim could be justified only if (1) a plan could not have been confirmed without a settlement or (2) the amount Ad'Maginations would have received under a confirmed plan would have equaled or exceeded the amount of the settlement, including all legal costs. Friedman did not and could not introduce evidence to show that the work on the Ad'Maginations' claim provided any value to the estate. For dealing with this claim, Friedman sought $1,130.60 for 6 hours of work by him and Grosse.

A significant portion of the fee, more than 10%, represented time spent in response to the United States Trustee's objections or comments filed in response to Friedman's deficient pleadings or in response to the U.S. Trustee's motion to dismiss grounded on the Debtor's failure to file required reports. Throughout the case, Friedman drew an artificial distinction between Rivers and his professional corporation that showed Friedman's fundamental lack of understanding of the importance of the financial aspects of the Debtor's business in achieving a successful reorganization.

The court concludes that Friedman and Grosse are incompetent to handle Chapter 11 cases and the court questions whether either of them has the competence to handle a case

under Chapter 13 or Chapter 7. Friedman and Grosse ignored the fiduciary nature of their representation and the need for an independent, competent debtor, demonstrating that they do not understand fundamental concepts of bankruptcy practice. The legal work reflected in the pleadings filed by Friedman and Grosse was pitifully inadequate. They were as responsible as the Debtor for making certain that Rivers opened the proper bank accounts and prepared and timely filed accurate monthly reports. Friedman sought to place all of the blame on Rivers for not opening a DIP account and preparing proper reports, which only served to underline his woeful lack of understanding of his own duties. Because of the breaches of fiduciary duty, the shoddy work product, the unnecessary projects such as the Ad'Maginations settlement and Autrey litigation, and the lack of any reasonable prospect that a plan could be confirmed, the services rendered by Friedman and his colleagues had no value to the estate.

Finally, Friedman mishandled the employment of his firm as counsel. The motion to employ counsel and the order drafted by Friedman refer only to Friedman. The motion stated that Friedman would charge $150 per hour. The court never authorized Grosse or another person associated with Friedman to represent the Debtor. An order approving the employment of other attorneys and paralegals is not required if the applicant is a corporation or partnership. Fed.R.Bankr.P. 2014(b). Here, Friedman was the applicant and the only person authorized to render services as an attorney for the Debtor. Moreover, the rate charged by Friedman exceeded the amount that he led the Debtor and the court to believe would be charged. The attempt to charge $175 per hour for the time of Grosse, a lawyer with a mere three years of experience, smacks of padding the bill. The going rate for a three-

year associate with no more training or experience than Grosse has is no more than $105 per hour.

The foregoing analysis does not exhaust examples of the lack of competence in Chapter 11 matters demonstrated by Friedman and Grosse in this case, but it demonstrates that sufficient grounds exist to deny compensation pursuant to section 330(a). An attorney is not entitled to compensation when he or she undertakes representation in a bankruptcy matter without possessing the requisite skill, background and knowledge to do so competently. *Matter of 437 Park Corp.*, 54 B.R. 326, 329 (Bankr. S.D.N.Y.1985); *In re Byman Furniture and Interiors, Inc.*, 14 B.R. 230, 232–33 (Bankr. S.D.Tex.1981). In *437 Park Corp.* the court ordered the attorney for the chapter 11 debtor to disgorge a retainer, citing a violation of an ethical standard providing that an attorney may accept employment only in matters the attorney is or intends to become competent to handle. *437 Park Corp.*, 54 B.R. at 329. Canon 6 of the Code of Professional Responsibility adopted by the State Bar of Georgia similarly provides, "A lawyer should represent a client competently." The State Bar has authority to discipline a lawyer who fails to abide this Canon. State Bar of Georgia Code of Professional Responsibility DR 6–101 [4]; Rules and Regulations for the Organization and Government of the State Bar of Georgia, Rule 4–102, Standard 43.[5]

The court having found that Friedman disregarded his duty to inform the court and the United States Trustee that the Debtor was incompetent, that Friedman exercised undue control and influence over the Debtor and thereby was an insider, that Friedman held interests adverse to the interests of the estate and breached his duty of loyalty to the Debtor, that Friedman sought and accepted postpetition compensation from the incompetent debtor without proper disclosure or au-

---

**4.** DR 6–101. *Failing to Act Competently.*
(A) A lawyer shall not:
(1) handle a legal matter which he knows or should know that the is not competent to handle, without associating with him a lawyer who is competent to handle it;
(2) handle a legal matter without preparation adequate in the circumstances; . . .

**5.** Standard 43. A lawyer shall not handle a matter which he knows or should know that he is clearly incompetent to handle without associating with him a lawyer whom he reasonably believes to be competent to handle it. A violation of this standard may be punished by disbarment.

thorization, that the work performed by Friedman was inferior, unnecessary and of no value to the estate and that employment of persons for whose time Friedman sought to be compensated was never approved by this court, it is

ORDERED and ADJUDGED that the fee application of Hirsch Friedman is DENIED in all respects and Hirsch Friedman is directed to repay to A. Herbert Rivers the retainer of $3,500 received by him prior to the filing of this case and $1,500, the amount paid to him by Rivers during the pendency of this case, for a total of $5,000.00 on or before April 20, 1994.